THOMAS J. EWING et al., *Appellants*, V. WILLIAM J. NESBITT, *Appellee*.

No. 17,929.

SYLLABUS BY THE COURT.

1. ESTATES TAIL—*Exist in Kansas.*  Estates tail resulting from the judicial interpretation of the statute *de donis conditionalibus* (13 Edw. I, c. 1, June 28, 1285), as modified by subsequent statutes and judicial decisions, were introduced into this country at the time of its colonization, with other parts of English jurisprudence, and still exist in this state.

2. ——— *Characteristics—Barred by Fine and by Recovery.*  One of the characteristics of these estates as we received them was that they were capable of being barred by fine and by common recovery, which were looked upon as legal modes of transfer having the effect of conveyances of record.

3. ——— *By Ordinary Deed.*  Fines and common recoveries are inconsistent with our modes of procedure.  But the fiction and the form only are obsolete.  The substantive result of the proceeding, a conveyance of record, may still be accomplished by an ordinary deed.

Appeal from Johnson district court.  Opinion filed February 8, 1913.  Affirmed.

*F. R. Ogg,* of Olathe, for the appellants.

*J. W. Parker,* of Olathe, for the appellee.

The opinion of the court was delivered by

BURCH, J.:.  In the year 1893 John Ewing made his will.  The fourth paragraph reads as follows:

"Fourth: I will and bequeath to my daughter, Mary A. Nesbitt, *nee* Ewing, and to the heirs of her body, the south half (½) of the northwest quarter (¼) of section No. twenty-one (21), township thirteen (13), of range twenty-four (24), in Johnson county, Kansas."

Devises using the same language were made to the testator's other children, four in number.  Besides these the will contained four other devises, which were

expressly stated to be "free and clear of all entail-
ment," thus clearly indicating the intention of the tes-
tator to create estates tail by the phraseology employed
in paragraph 4 and those like it.  In 1895 John Ew-
ing died, leaving as his heirs the five children who
were the beneficiaries of his will.  The will was duly
probated, the estate was administered and closed, and
Mary A. Nesbitt entered into possession of the tract of
land devised to her.  In the year 1909 she died without
having borne children and was survived by her hus-
band, William J. Nesbitt, who continued in possession
of the land.  Soon after Mary A. Nesbitt's death her
brothers and sisters commenced an action of eject-
ment, and for rents and profits, against William J.
Nesbitt, claiming to be owners in fee simple.  He
answered claiming a one-fifth interest in the land and
praying for partition.  Judgment was rendered for the
defendant and the plaintiffs appeal.

The will contained a residuary clause in which the
testator gave to his children surviving him, share and
share alike, "all other property, goods, chattels,
moneys, stocks, credits, and effects" of which he might
die seized.  The defendant claims that his wife was the
donee of an estate tail; that the donor retained a rever-
sionary interest in fee simple expectant upon the estate
tail; that if, by virtue of the residuary clause of the
will, this reversion was not disposed of it descended,
upon the death of the donor, to his heirs, one of whom
was his daughter, Mary A. Nesbitt; and that upon her
death the defendant, as her surviving husband, took
her share of the fee, which was one-fifth.  If, however,
the residuary clause of the will was effectual to devise
the reversion to the testator's children, Mary A. Nes-
bitt took a one-fifth interest which, upon her death, de-
scended to the defendant.  Under either theory the de-
fendant's claim to a one-fifth interest in the land is
valid if the law of this state recognizes estates tail as

they existed under the common law of England at the time of the colonization of this country.

Under the early common law a grant to a man and the heirs of his body was a grant of a fee on condition that he had heirs of his body. The fee so granted was designated a conditional fee. If the donee had no heirs of his body, the condition was not performed and the land reverted to the donor. If heirs of the donee's body were born, the condition was regarded as performed and the donee was at liberty to make a conveyance which would bar him, his issue, and the donor's reversion. He could likewise charge the land with rents and encumbrances which would bind his issue, and the estate was forfeitable for his treason. If the condition were performed but the donee made no conveyance, the land descended, upon his death, to the specified issue, who were at liberty to convey. If they made no conveyance the land reverted to the donor. If the condition were performed but the issue died, and the donee then died without having made a conveyance, the land reverted to the donor. In order to bar the possibility of reverter to the donor and to restore the descent to its ordinary course under the common law, donees of conditional fees were in the habit of making conveyances as soon as issue was born and taking back warranty deeds. To stop this practice, which evaded the condition and defeated the intention of the donor, the nobility of the realm, who were desirous of perpetuating family possessions, procured the passage of the statute of Westminster II, known as the statute "*de donis conditionalibus.*" (13 Edw. I, c. 1, June 28, 1285.) This statute took away the power of alienation and declared that the will of the donor, plainly expressed, should be observed, and that tenements given to a man and the heirs of his body should go to his issue, if there were any, and if not should revert to the donor. The judges interpreted this statute to mean

that the donee no longer took a conditional fee capable of being disposed of as soon as issue was born, but that he took a particular estate, denominated an estate tail, and that instead of a possibility of reverter only remaining in the donor, he had a reversion in fee simple expectant upon the failure of issue. Some of the social consequences of this statute are thus described by Blackstone:

"Children grew disobedient when they knew they could not be set aside: farmers were ousted of their leases made by tenants in tail; for, if such leases had been valid, then under colour of long leases the issue might have been virtually disinherited; creditors were defrauded of their debts; for, if a tenant in tail could have charged his estate with their payment, he might also have defeated his issue, by mortgaging it for as much as it was worth; innumerable latent entails were produced to deprive purchasers of the lands they had fairly bought; of suits in consequence of which our ancient books are full: and treasons were encouraged, as estates-tail were not liable to forfeiture, longer than for the tenant's life. So that they were justly branded, as the source of new contentions, and mischiefs unknown to the common law; and almost universally considered as the common grievance of the realm. (2 Commentaries, *116.)

Notwithstanding these mischiefs, the statute forms one of the fundamental institutes of the land law of England which three and a quarter centuries later was transplanted in the New World.

Before the settlement at Jamestown, in the fourth year of James I (1607), a number of statutes had been passed whereby the privileges attending estates tail were much abridged. They were made forfeitable for treason. (26 Henry VIII, c. 13.) Certain leases by the tenant in tail not prejudicial to the issue were allowed to be good in law. (32 Henry VIII, c. 28.) The statute of fines (4 Henry VII, c. 24) was construed to permit the tenant in tail and his heirs to be barred by levying a fine (32 Henry VIII, c. 36). Such estates

were chargeable with the payment of certain debts due the king (33 Henry VIII, c. 39), and by construction of the statute, 43 Eliz. c. 4, an appointment to charitable uses by a tenant in tail was held to be good (2 Bl. Com. 117 *et seq.*). The most serious blow, however, to the evils fostered by estates tail under the statute *de donis* was struck by a bold piece of judicial legislation. In Taltarum's case, reported in Year Book, 12 Edw. IV, 19 (1472), the judges, upon consultation, held that a common recovery suffered by a tenant in tail accomplished the complete destruction of the estate tail. This mode of barring estates tail is thus described in 1 Washburn on Real Property, 6th ed., § 186:

"This was a fictitious suit brought in the name of the person who was to purchase the estate, against the tenant in tail who was willing to convey. The tenant, instead of resisting this claim himself, under the pretence that he had acquired his title of some third person who had warranted it, vouched in, or, by a process from the court, called his third person, technically the vouchee, to come in and defend the title. The vouchee came in as one of the *dramatis personæ* of this judicial farce, and then without saying a word disappeared and was defaulted. It was a principle of the feudal law adopted thence by the common law, that if a man conveyed lands with a warranty, and the grantee lost his estate by eviction by one having a better title, he should give his warrantee lands of equal value by way of recompense. And as it would be too barefaced to cut off the rights of reversion as well as of the issue in tail, by a judgment between the tenant and a stranger, it was gravely adjudged, 1st, that the claimant should have the land as having the better title to it; and 2d, that the tenant should have judgment against his vouchee to recover lands of equal value on the ground that he was warrantor, and thus, theoretically, nobody was harmed. If the issue in tail or the reversioner, or remainder-man, lost that specific estate, he was to have one of equal value through this judgment in favor of the tenant in tail, whereas in fact the vouchee was an irresponsible man, and it was never expected that he was anything more than a dummy in the game. The

result of this, which Blackstone calls 'a kind of *pia fraus* to elude the statute *De Donis*,' was that the lands passed from the tenant in tail to the claimant in fee simple, free from the claims of reversioner, remainderman, or issue in tail, and he either paid the tenant for it as a purchaser, or conveyed it back to him again in fee-simple.''

The precedent of fictitious suits as means of acquiring or conveying property was found in the Roman law, and the practice of resorting to them was supposedly introduced in England by the clergy to evade the statute of mortmain. (Spence's Equitable Jurisdiction of the Court of Chancery, p. 141, note.) The solemn piece of jugglery already described later became more involved.

"Complex, however, as the proceedings above related may appear, the ordinary forms of a common recovery in later times were more complicated still; for it was found expedient not to bring the collusive action against the tenant in tail himself, but that he should come in as one vouched to warranty. The lands were, therefore, in the first place conveyed, by a deed called the recovery deed, to a person against whom the action was to be brought, and who was called the tenant to the præcipe or writ. The proceedings then took place in the Court of Common Pleas, which had an exclusive jurisdiction in all real actions. A regular writ was issued against the tenant to the præcipe by another person, called the demandant; the tenant in tail was then vouched to warranty by the tenant to the præcipe. The tenant in tail, on being vouched, then vouched to warranty in the same way the crier of the Court, who was called the common vouchee. The demandant then craved leave to imparl or confer with the last vouchee in private, which was granted by the Court; and the vouchee, having thus got out of Court, did not return; in consequence of which judgment was given in the manner before mentioned, on which a regular writ was directed to the sheriff to put the demandant into possession." (Williams on Real Property, 17th ed., p. 108.)

In all cases there was an agreement or understanding that the person who acquired an estate tail by means of a common recovery should pay for it, or convey it to the original tenant in tail in fee simple, or dispose of it as such tenant might direct. The result was that estates tail and all remainders over and the reversion were effectually barred. As Blackstone said, by long acquiescence and use, these recoveries came to be looked upon as a legal mode of conveyance by which a tenant in tail might dispose of his land. (2 Com. *117.) This right of conveyance became, in contemplation of the law, an inherent and inseparable incident of an estate tail and covenants and conditions attempting to restrain the exercise of the right were held to be void. (1 Washburn on Real Property, 6th ed., § 188.) The same purpose was accomplished by the equally fictitious proceeding of fine.

In volume 4 of his Commentaries, 14th ed., p. *14, Chancellor Kent said:

"Estates tail were introduced into this country with the other parts of the English jurisprudence, and they subsisted in full force before our Revolution, subject equally to the power of being barred by a fine or common recovery."

These estates are now very generally changed by legislation into fee simples, or reversionary estates in fee simple, or may be converted into fee simples by ordinary conveyance. (2 Bl. Com. 119, Cooley's Note.) In the pages following the above quotation from Kent much of this legislation is referred to.

The territorial legislature of 1855 passed an elaborate act relating to conveyances. (Stat. of Kan. Terr. 1855, ch. 26.) Section 5 of this act reads as follows:

"That from and after the passage of this act, where any conveyance or devise shall be made whereby the grantee or devisee shall become seized in law or equity of such estate, in any lands or tenements, as under the statute of the thirteenth of Edward the first, (called the statute of entails) would have been held an estate

in fee tail, every such conveyance or devise shall vest an estate for life only in such grantee or devisee, who shall possess and have the same power over and right in such promises, and no other, as a tenant for life thereof would have by law; and upon the death of such grantee or devisee, the said lands and tenements shall go and be vested in the children of such grantee or devisee, equally to be divided between them as tenants in common, in fee; and if there be only one child, then to that one, in fee; and if any child be dead, the part which would have come to him or her, shall go to his or her issue; and if there be no issue, then to his or her heirs."

This, of course, constituted a deliberate legislative modification of the common law relating to estates tail. In 1859 the territorial legislature completely revised the act of 1855 relating to conveyances, making radical changes in its substance and content. (Laws 1859, ch. 30.) The subject matter of the section quoted was entirely omitted and nothing whatever was substituted for it either in the revision or in any other statute. The result was that section 5 was repealed by implication, and since the legislature had its attention specially directed to estates tail by that section the purpose evidently was to restore the common law on the subject. This intention is made more apparent by the passage of the following act at the same session:

"The common law of England and all statutes and acts of Parliament in aid thereof, made prior to the fourth year of James the First, and which are of a general nature, not local to that kingdom and not repugant to or inconsistent with the constitution of the United States and the act entitled 'An act to organize the Territory of Nebraska and Kansas,' or any statute law which may from time to time be made or passed by this or any subsequent Legislative Assembly of the Territory of Kansas, shall be the rule of action and decision in this Territory, any law, custom or usage to the contrary notwithstanding." (Laws 1859, ch. 121, § 1.)

The constitution adopted in July 1859, under which the state was admitted to the Union on January 31, 1861, contains nothing which bears upon the subject either directly or remotely, and the legislature has not since dealt with it. Nothing is to be found in the acts relating to conveyances, descents and distributions, or wills, incompatible with the existence of such estates, and in their unfettered form such estates are not out of harmony with the conditions and wants of the people of Kansas. On the other hand, they exactly meet the requirements of testators in the situation of John Ewing. He desired to give his daughter an estate for life, in order to secure to her a home and some measure of comfort and welfare while she lived. After that he desired that the remainder should go to her children in fee. But he did not desire that his son-in-law should take the whole gift should she die childless, to be enjoyed by him and perhaps a strange second wife and their children. The court knows of no reason in law, morals, or public policy why these sentiments should not be respected, and they were clearly and fully expressed by the language of the will, interpreted by the common law. The overweening propensity to perpetuate family name and family property which made estates tail so obnoxious in the middle ages is fairly curbed by the right of a tenant in tail to convert his tenancy into a fee simple, and is not a menace to the general welfare of the people of this state; and it will be remembered that this right became one of the characteristics of the estate. Fines and recoveries, however, are not adapted to any of our needs, are inconsistent with the code of civil procedure and consequently can not be resorted to, as portions of the common law, in aid of the general statutes of this state. (Gen. Stat. 1909, § 9850.) The effect of these indirect, fictitious and operose proceedings was merely that of a deed of record, and the same end may now be accomplished by an ordinary conveyance. The fiction and the

form alone are obsolete.  The substance of the proceeding—a conveyance—and the essential character of the estate tail—the right to convert the estate into a fee simple by a conveyance—are preserved.  If, therefore, Mary A. Nesbitt had chosen, in her lifetime, to make a conveyance of the land devised to her, she would thereby have barred herself, her issue, born and unborn, and her father's reversion.

While the mere possibility of a reverter such as attended conditional gifts under the ancient common law is not a subject of disposal by will, reversions in fee under the statute *de donis* may be devised.  The result is that Mary A. Nesbitt was given by the will an estate tail in the land in controversy.  She also took by virtue of the residuary clause of the will, one-fifth of the reversion in fee expectant upon her death without issue.  Upon her death this interest passed to her husband, the defendant.

The judgment of the district court is affirmed.