### No. 26,215.

LUCILE ALLEN, *Appellee,* v. (JOSEPH M. PEDDER) WILLIAM CLARKSTON, *Appellant.*

#### SYLLABUS BY THE COURT.

WILLS—*Construction—Estates Tail.* The provisions of a will considered, and held to create an estate tail.

Appeal from Jewell district court; WILLIAM R. MITCHELL, judge. Opinion filed December 5, 1925. Affirmed.

*D. M. McCarthy* and *L. E. Weltmer,* both of Mankato, for the appellant.

*R. W. Turner, D. F. Stanley* and *R. B. Turner,* all of Mankato, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by a purchaser of land from a devisee, to quiet title against a person claiming a contingent interest under the will. The petition stated the facts, a demurrer to the petition was overruled, the claimant, Clarkston, stood on the demurrer, and judgment was entered for plaintiff. The claimant appeals.

On June 1, 1921, William A. Pedder made the will in question. He died on April 13, 1922, and the will was duly probated. The item of the will material to the controversy reads as follows:

"Third: I give, devise and bequeath to my adopted son, Joseph Pedder, the following-described real estate, to wit: [Description], to be used by my said adopted son, Joseph Pedder, for and during his natural life, and after his death I give, devise and bequeath said real estate to his children, of his own blood, born in lawful wedlock.

"Should my adopted son, Joseph Pedder, die without children of his own blood born in lawful wedlock, then I give and devise said real estate to my great-nephew, William Clarkston, 27 Garsland Road, Washam, Near Kirkham, Lancanschire, England."

Joseph Pedder was a single man, having no children, and on January 24, 1924, he conveyed the land to plaintiff by warranty deed. The district court held Joseph took an estate tail, which was converted into a fee simple by his conveyance.

---

Wills, 40 Cyc. p. 1597; 29 L. R. A., n. s., 1117; 28 R. C. L. 257.

In *Ewing v. Nesbitt*, 88 Kan. 708, 129 Pac. 1131, it was demonstrated that the legislature restored estates tail to a place in the common law of this state, after having abolished them; that one of the characteristics of such estates, as we received them, is that the entail may be defeated by ordinary conveyance; and that in this form such estates are adapted to meet the wants of the people, and are not detrimental to the general welfare. In *Gardner v. Anderson*, 116 Kan. 431, 227 Pac. 743, it was shown that recent efforts to change the common law relating to estates tail had failed in the legislature. In the Gardner case (114 Kan. 778, 227 Pac. 743, and 116 Kan. 431, 227 Pac. 743), it was held that a gift by will to one for life only, and then to issue of the life tenant, with reversion to the estate of the testator in the event of no issue, gave the first taker an estate tail. The decisions in the Ewing case and the Gardner case established a rule of property, and govern the present controversy.

Suppose the will had said, "I give my land to Joseph and his children of his own blood lawfully begotten." There would have been no doubt that an estate tail was created. The meaning would be as clear as if the testator had used the technical term, "lawful heirs of his body." Suppose the will had said, "I give my land to Joseph, and at his death to his children of his own blood lawfully begotten." Under the law applicable to such a gift, nothing would be added to the shorter expression. While the phraseology of the actual will is expanded still more, the thought expressed is neither changed nor enlarged. Whether disappointed of a son of his own blood, or for some other reason, William Pedder turned to Joseph and, contemplating Joseph's marriage and the birth of children, undertook to found a line of legitimate succession to his property, with Joseph at its head. At his death the land was to go to Joseph. At Joseph's death, it was to go to his children of his own blood born in lawful wedlock. Should this scheme be thwarted, the land was to go to Clarkston. The word "blood" is the popular term to indicate consanguinity. Since any legitimate child Joseph might beget would necessarily be of his own blood, the court is satisfied the testator had in mind Joseph's legitimate issue, and meant to express lineage. Heirship generally was cut off. Only those of Joseph's blood born in lawful wedlock could take, and they were to inherit until Joseph's blood became extinct. The statute of Westminster II, 13 Edw. I, known as the statute *"De Donis Conditionalibus"* (1285), was en-

acted to make this kind of a devise come true. The first taker was forbidden to aliene, and when issue failed, the land reverted to the donor or his heirs. The social forces making for freedom to convey became strong enough that Taltarum's case, decided 200 years later (Y. B. 12 Edw. IV, 19 [1472]), sanctioned the barring of both entail and donor by common recovery. As indicated in the Ewing case, the effect of a common recovery was a conveyance of record —under our law an ordinary deed. The result is, Joseph took an estate tail, which he converted into a fee simple by his warranty deed to plaintiff.

Clarkston cites the case of *Purl v. Purl*, 108 Kan. 673, 197 Pac. 185. In that case the will gave land to a son to have during his life, and at his death it was to go to his children, if he had any living, and if not, to his brothers and sisters. It was taken for granted by the litigants that the children took, if at all, by purchase, and the question was, whether the remainder was vested or was contingent until death of the life tenant. The assumption was well founded. The limitation over was made on definite failure of children living at the time of the life tenant's death. The life tenant had children living when the will was made and when it took effect, and the will as a whole indicated that the testator was himself giving to such of the son's children as should survive the son. The question is always one of intention, to be ascertained by interpretation of the will: Was the descriptive word used in a definite sense, as *designatio personæ*, or as contemplating the whole of a class of descendants? In this instance, Joseph's children would take, not as primary objects of the testator's bounty, but because they would be the first of Joseph's blood.

Authorities are cited that an estate tail will not be implied when the limitation over is on definite failure of issue, and it is contended that this will discloses a limitation over on definite failure of issue. Definite failure of issue means just what the term imports—as for example, death of the first taker without issue before reaching the age of twenty-one, death without issue living at the time of death, and the like. All the authorities which are not disposed to depart from fundamental rules, hold that a will in the form of the Pedder will imports indefinite failure of issue. It is sufficient to cite: *Winchell v. Winchell*, 259 Ill. 471, 475; *Hertz v. Abrahams*, 110 Ga. 707, 710; *Eichelberger v. Barnitz*, 9 Watts (Pa.) 447, 450; *Barber v. Pittsburgh, &c., Railway*, 166 U. S. 83.

The authorities to the contrary are those which are quick to seize upon anything to defeat estates tail. There is no such policy in this state. In the opinion in the case of *Richardson v. Richardson,* 80 Me. 585, it was said:

"An application of plain rules to plain facts ought to produce satisfactory results in the construction of wills. The intricacy on the subject has largely grown up from the distaste which the people and courts have for certain classes of devises. Judge Curtis, in *Abbott v. The Essex Company,* 2 Curtis, (C. C.) 126, says: 'I think it may be said with truth, that the American courts, while they have recognized the rule (relating to the creation of estates tail), have shown a strong disposition to lay hold on pretty slight expressions in the will to defeat its operation; a tendency which has been effectually sanctioned not only in several states in this country, but in England, by legislation which abolishes the rule altogether.' Now, that our statute has ameliorated the effect of the rule, by allowing any person seized of land in tail to convey it in fee simple, there need not be much difficulty in the way of bestowing upon such devises a fair and consistent construction." (p. 591.)

While we have no statute on the subject, Kansas is in the category of those states which recognize true estates tail, but permit the tenant in tail to break entailment by conveyance.

The judgment of the district court is affirmed.

BURCH, J. (concurring): The Gardner case was twice argued. The writer did not hear the arguments or participate in the decision. Since the Pedder case was assigned to him, he has read the voluminous literature which accompanied presentation of the Gardner case. His conclusion is, the decision was sound.

In the Gardner case the will read as follows:

"First. I hereby give and bequeath to Anna Thomas the sum of seven hundred fifty dollars, also all of my household effects, consisting of furniture, bedding, dishes, and in fact all household goods.

"Second. I hereby give and bequeath to my daughter, Georgia Gardner, the remainder of my property, both personal and real, for the length of her lifetime only. My direct intention being that she shall have the income only from said property.

"Third. Should my daughter, Georgia Gardner, marry and have issue, then I direct that at her death my property shall descend to them equally, share and share alike. In the event of no issue, then at her death all my property shall revert to the Gardner estate.

"Fourth. I direct that all my debts and expenses incurred in my last sickness shall first be paid.

"Fifth. I hereby appoint Arthur R. Anderson and Harry Dickens trustees to carry out the provisions of this will, and they shall have the power to make such investments as to them seem best, and shall pay over to the said Georgia Gardner the net income from said property. I direct that said trustees shall

not be required to give bond." (*Gardner v. Anderson, Trustee,* 114 Kan. 778, 227 Pac. 743.)

Subject to the bequest given in the first item, Georgia was given the whole of the testator's estate, amounting to between $40,000 and $50,000, for her life. The trustees took no title; they were appointed to manage. By providing for trustee management and payment of income, the father instituted a practical method insuring that the estate would be of most use, benefit and enjoyment to his only child, a daughter.

Georgia might marry. If she married, she might have issue. There are wills without number in which it may appear from the context that the words "issue," "descend," and "revert," have been loosely employed. We have no general liberty to say, however, that a testator did not intend his words to operate in the sense they carry, and there is nothing whatever on the face of this will to indicate that the terms were not used with precision, according to their appropriate meaning. The relationship to the testator of Anna Thomas is not stated. The bequest to her is so small and is of such a nature it could not have moved the testator to make a will, and it is manifest that the occasion of this will was the potentiality of Georgia's marrying and having issue. The testator was not concerned with that subject with respect to individuals whom he desired to benefit. Georgia was single, and he visualized no child of hers, or grandchild of his, as taking originally from him in its own right. Succession to Georgia was the dominating thought. That succession he desired to limit to a class taking as Georgia's issue and because Georgia's issue. Therefore, he said the property should descend to her issue, and in the event of no issue it should revert to his estate.

The second item of the will gave Georgia a life estate only, a freehold not of inheritance. The third item gave her an estate tail, a freehold of inheritance. A freehold not of inheritance cannot be a freehold of inheritance. What did Georgia take?

The statute *de donis* applied to a gift to A and the heirs of his body, and the purpose was to make the will of the donor prevail according to the form of the gift. The statute provided that A should have no power to aliene, the land should remain to his issue, and on failure of issue it should revert to the donor. Therefore, A had the use and enjoyment of the gift for life, then his issue took, and in the event of no issue, the property reverted—which are the very terms of the Gardner will.

In early feudal times, if land were given to A, A took for life only. If his heirs were to take, the gift had to be to A and his heirs. By and by, when gifts were to A for life and at his death to his heirs, it was conceived that the gift came to the same thing as a gift to A and his heirs. In either case, when A died his heirs took. Sometimes, however, it became important to know how the heirs took, whether by descent from A or by purchase from the donor. In a case found in Y. B. 18 Edw. II, 577 (1324), it was held that, in case of a gift to A for his life and then to his heirs, the heirs took by limitation, and not by purchase. This case, decided forty years after the statute *de donis*, was the origin of the rule applied in Shelley's case, which was decided in 1581 (1 Coke 93a).

A generalized statement of the rule in Shelley's case is that where in any instrument an estate for life is given to an ancestor, and afterwards by the same instrument an estate is limited, either mediately or immediately, to his heirs or heirs of his body, the word heirs is a word of limitation, and not of purchase, and the ancestor takes the whole estate. It is plain this rule may run counter to the donor's intention.

The statute of wills, 32 Henry VIII (1540), gave "full and free liberty" to devise land, the first direct recognition of such privilege. In considering wills, the intention of the testator was regarded, and it was inevitable the question should be raised, how far the rule in Shelley's case ought to prevail against a testator's intention. It is familiar legal history that the rule became a fundamental institute of land law, governing all cases in which it is not demonstrable to point of certainty that the word "heirs" was used to designate an individual, or particular persons, and not a class of successors. While the conservative policy of restricted alienation always preferred descent to purchase, the rule was in accord with the opposing policy of freedom of alienation, because of the enlarged privilege of the first taker.

It was not long after the founding of the American colonies until we began to get decisions quite pertinent to the question under consideration. *King v. Melling*, 2 Lev. 60, was decided in 1672. Hale, chief justice of the king's court, was of the opinion that, when there is a devise by express words to one for life, it cannot be good construction to construe the words "and after his death to his issue," so as to destroy the effect of the express words. Twysden and Rainsford were inclined to Hale's opinion. An adjournment was taken,

and on another day "Hale, upon consideration of the books, changed his opinion." The others adhered to the view that only an estate for life was given, and judgment was entered accordingly. Upon error to the exchequer chamber, Hale's view that an estate tail was given, was approved by all the judges, and a reversal was pronounced. In that case, Robert Melling devised to Bernard Melling for life, and after his death to the issue of his body by a second wife (to whom he was not yet married), and in default of such issue, to John Melling. The case has been cited and applied many times, and its authority has never been shaken.

Beginning with the early 1700's, the cases in which a similar result was reached are numerous, and in 1756 the leading case of *Robinson v. Robinson,* 1 Burr. 38, was decided. The controversy originated in the court of chancery, and a case was stated for the opinion of the court of king's bench. The question was, the proper construction of a will to L. H. for his life "and no longer," and after his death to such son as he should have lawfully begotten, and in default of such issue, to W. R. in fee. *King v. Melling* was strongly relied on in the argument, and it was held that L. H. took an estate tail male, to effectuate the general intention of the testator, notwithstanding the express devise to L. H. for his life and no longer. The case finally reached the house of lords, under the title *Robinson v. Hicks,* and the holding of the court of king's bench was approved. (3 Brown's Parl. Rep. 180 [1758].)

In 1801, the case of *Doe v. Cooper,* 1 East, 229, was decided by the court of king's bench. The will gave land to R. C. for the term of his life only, and after his decease to the issue of R. C., but in case R. C. died without leaving issue, then to E. H. in fee. It was held R. C. took an estate tail. A portion of Lord Kenyon's opinion follows:

"Cases of this kind have been so much agitated of late, that all the arguments occur readily to one's mind; and after the decisions which we have made we should not be consistent with ourselves if we were not to hold that the first taker took an estate tail in this case. It has been the settled doctrine of Westminster Hall for the last forty or fifty years that there may be a general and a particular intent in a will, and that the latter must give way when the former cannot otherwise be carried into effect. I remember that point much discussed in the case of *Robinson v. Robinson,* 1 Burr. 38. I heard it argued the first time before a very great lawyer, Sir Dudley Rider, who then presided in this court. A second argument was directed, but he died before it came on. It was argued a second time before Lord Mansfield, and the certificate, which was afterwards returned upon the greatest deliberation, is in

print. Nothing could be more positive than the words of the will in that case to shew a particular intent that the first taker should take an estate for his life *and no longer*. But there was a general intent apparent, which could not be effected but by giving him an estate tail, and on that the decision was founded. The case was carried up to the house of lords while Lord Hardwicke sat there, and was much considered by him; and questions were put to the judges upon it framed by him in every possible shape; and Lord Ch. B. Parker, who is known to have been a very strict lawyer, delivered their opinions agreeing with the judgment of this court. The same question came on again to be considered in *Roe d. Dodson v. Grew,* 2 Wils. 323, in the court of common pleas, and was there much canvassed, and underwent the same determination. Then came on the case of Doe on the demise of *Candler v. Smith,* in the 7 Term Rep. 531, in which I thought I could not make the matter more clear than by reading the words of Lord Ch. J. Willes in *Roe d. Dodson v. Grew.* I will not go through all the cases again which have been so fully considered in those I have alluded to. Perhaps we should best fulfill the particular intent of the testator in this case by giving Richd. Cock only an estate for life; but the general intent was that all his issue should inherit the entire estate before it went over; and that intent can only be answered by giving him an estate tail by implication from the subsequent words 'in default of his leaving issue.' " (p. 233.)

In November, 1844, the case of *Harrison v. Harrison,* 7 M. & G. 938, was decided. The testator devised real estate to his children as tenants in common during their respective lives, and afterwards to their issue as tenants in common. The cases of *Robinson v. Robinson* and *Doe v. Cooper* were relied on in argument, and the court of common pleas held the testator's children were devisees of an estate tail as tenants in common, and his grandchildren took nothing.

Further review of the cases is not necessary. In the latest edition of Jarman on Wills (1910), the editors permitted the following observation of the learned author respecting *Robinson v. Robinson* to stand:

"The authority of this case has long been beyond the reach of controversy, not only from its having been decided by the highest tribunal, but in consequence of its frequent recognition." (2 Jarman on Wills, 6th ed., p. 1919.)

The result is, the English courts have permitted but one interpretation of a devise to A expressly for his life, and after his death to his issue, and over in default of issue. While the rule adopted is properly a rule of interpretation, it has been applied so consistently that it approaches a rule of property. Although it is of no significance, it is interesting that *Harrison v. Harrison* was decided on the eve of the passage of the Kansas-Nebraska act.

When estates tail were temporarily abolished by the territorial

act of 1855, the legislature undertook to abrogate the rule in Shelley's case as applied to both deeds and wills. The section of the statute relating to conveyances reads as follows:

"Where a remainder shall be limited to the heirs, or heirs of the body, of a person to whom a life estate in the same premises shall be given, the persons who, on the termination of the life estate, shall be the heirs, or heirs of the body of such tenant for life, shall be entitled to take as purchasers by virtue of the remainder so limited in them." (Stat. Kansas Territory, 1855, ch. 26, § 7.)

The statute relating to wills reads as follows:

"If any person, by last will, devise any real estate to any person for the term of such person's life, and after his or her death to his or her children or heirs, or right heirs in fee, such devise shall vest an estate for life only in such devisee, and remainder in fee simple in such children." (Stat. Kansas Territory, 1855, ch. 164, § 44.)

The term "right heirs" may have many meanings, but Black's Law Dictionary, under the title "Heir," contains the following:

"*Right Heir.* This term was formerly used, in the case of estates tail, to distinguish the preferred heir, to whom the estate was limited, from the heirs in general, to whom, on the failure of the preferred heir and his line, the remainder over was usually finally limited." (p. 566.)

Both the foregoing statutes were repealed in 1859, and the rule in Shelley's case was restored, both as to deeds and wills, at the same time estates tail were restored. At the same session of the legislature the following were enacted:

"In the construction of the statutes of this territory the following rules shall be observed, unless such construction would be inconsistent with the manifest intent of the general assembly or repugnant to the context of the statute:

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"Seventh, The word 'issue,' as applied to the descent of estates, includes all the lawful lineal descendants of the ancestor: . . '." (Kansas Stat. 1859, ch. CXX, § 1.)

"The common law of England and all statutes and acts of parliament in aid thereof, made prior to the fourth year of James the First, and which are of a general nature, not local to that kingdom and not repugnant to or inconsistent with the constitution of the United States and the act entitled 'An act to organize the territory of Nebraska and Kansas,' or any statute law which may from time to time be made or passed by this or any subsequent legislative assembly of the territory of Kansas, shall be the rule of action and decision in this territory, any law, custom or usage to the contrary notwithstanding." (Kansas Stat. 1859, ch. CXXI, § 1.)

The law stood thus until the statutory revision of 1868. At that

time it was settled law that, under the rule in Shelley's case, if the limitation were to heirs, the first taker took a fee simple; if the limitation were to heirs of his body, he took an estate tail; the rule applied to a devise to A for life, and after his death to his issue; and the word "issue" was *prima facie* a word of limitation. The legislature of 1868 did not abolish or curtail estates tail, left the rule in Shelley's case in full force as applied to conveyances, retained the provision that issue means, not merely some, but all lineal descendants, and placed the following in the statute of wills:

"When lands, tenements or hereditaments are given by will to any person for his life, and after his death to his heirs in fee, or by words to that effect, the conveyance shall be construed to vest an estate for life only in such part taken, and a remainder in fee simple in his heirs." (R. S. 22-256.)

In view of this legislative history, I am not inclined to indulge in any free interpretation of the statute of 1868. The legislature was not engaged in a general assault upon estates tail and the rule in Shelley's case, as it was in 1855, and it deliberately chose its words. It did not authorize extension or enlargement of those words. It merely permitted use of expressions which would be equivalent to "for his life"; "after his death"; "heirs"; and "in fee." Heirs are those designated by statute to succeed to the estate of a deceased person. Under our statute of descents and distributions, one may be an heir of his wife, his son, and his brother. The word "heirs" is not qualified in the statute of wills, and I have no authority to qualify it. It means heirs, not a restricted class of heirs; and the rule in Shelley's case, which is a rule of property and not of interpretation, has not been abolished in this state as applied to a devise to A for life and after his death to his issue.

It has been customary to say that the rule in Shelley's case has been abolished in this state with respect to wills. The expression occurs in cases in which the devise was to A for life, and at his death to his heirs. The writer used it in the opinion in the case of *McCartney v. Robbins*, 114 Kan. 141, 217 Pac. 311, in which the devise was to a son for his natural life, and at his death "to his heirs as the statute in such case provides"—a clear case of a devise to the son, and after his death to his heirs generally, and within the statute. Further use of the expression will offend against accuracy.

It was not possible to meddle with the Gardner will by substituting for the word "issue" any term except an equivalent for it, such

as "heirs of her body." To do so might let in the very person or persons whom the testator desired to exclude; and as I read the will, that is the key to it. The devise to Georgia was not a matter dissociated from everything else, such as the gift to Anna Thomas. Neither was limitation of the devise to Georgia to a life estate of primary or principal concern to the testator in recognizing her. She was also regarded as progenitor of a line of descendants who were to succeed her. The whole estate went freely to her and her issue if issue were born; but nobody could take except Georgia and her issue, and the limitation was merely a part of this scheme of exclusion. Therefore, considering the whole will, the intention was to bring about just what occurs when an estate tail with devise over in default of issue, is created. The first taker enjoys for life, and his issue succeeds him. That being the will, the law takes hold of it and executes it as it was framed. In *Bryant v. Flanner*, 99 Kan. 472, 162 Pac. 280, the third item of the will created a true estate tail by use of the words "bodily heirs." Under the law, the will could not be so executed because of other provisions. In this instance, one item indicates life estate. Under the law, the will cannot be so executed because of other provisions.